# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00083-GJP-1 |
| | ) | |
| Plaintiff, | ) | Courtroom 5A |
| | ) | U.S. Courthouse |
| v. | ) | 601 Market Street |
| | ) | Philadelphia, PA 19106 |
| DAVID BOLWELL, | ) | |
| | ) | February 19, 2025 |
| Defendant. | ) | 1:50 p.m. |

### TRANSCRIPT OF DETENTION HEARING
### BEFORE HONORABLE CAROL SANDRA MOORE WELLS
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:               U.S. Attorney's Office
                                 By:  MICHELLE ROTELLA, ESQ.
                                 615 Chestnut Street
                                 Suite 1250
                                 Philadelphia, PA 19106-4476

For the Defendant:               Young Klein & Associates
                                 By:  GAIL N. MARR, ESQ.
                                 3554 Hulmeville Road, Suite 102
                                 Bensalem, PA 19020

ESR Operator:                    Kristen Makely

Deputy Clerk:                    E. Andrews

TRANSCRIPTION SERVICE:           TRANSCRIPTS PLUS, INC.
                                 435 Riverview Circle
                                 New Hope, Pennsylvania 18938
                                 215-862-1115
                                 CourtTranscripts@aol.com

 Proceedings recorded by electronic sound recording, transcript
                Produced by transcription service.

<u>INDEX</u>

                                                    <u>PAGE</u>

Brady instruction to the Government              3

Argument regarding detention by Ms. Marr        5

Argument regarding detention by Ms. Rotella     7

Response by Ms. Marr                            14

Response by Ms. Rotella                         18

Further response by Ms. Marr                    21

Further response by Ms. Rotella                 22

Ruling by the Court                             22

3

1           THE COURT:  The United States versus David Bolwell.

2           All right, it's my understanding that you have now

3   retained counsel here today.

4           MS. MARR:  That's correct, Your Honor.

5           THE COURT:  All right.

6           MS. MARR:  Gail Marr on behalf of the defendant.

7           THE COURT:  All right.  Be seated for a minute

8           To the government, I don't believe I've given you a

9   <u>Brady</u> instruction yet.

10          MS. ROTELLA:  You have not, Your Honor.

11          THE COURT:  I hereby issue an order confirming that

12  the United States has an obligation to timely disclose <u>Brady</u>

13  information to the defendant.

14          I remind government counsel that failure to comply

15  with these disclosure obligations may result in consequences

16  such as: the exclusion of evidence; the dismissal of charges;

17  contempt proceedings; disciplinary referral; and any other

18  relief authorized by law.

19          I will enter a written order further confirming these

20  obligations.

21          Do you understand and accept them?

22          MS. ROTELLA:  I do, Your Honor.

23          THE COURT:  All right.  In plain English, as you

24  heard me explain to the last defendant, that means if the

25  government has evidence that would help you prove that you are

4

1  innocent, they have to turn it over to your attorney.  You

2  understand that?

3          MR. BOLWELL:  (No verbal response).

4          THE COURT:  You have to talk.

5          MR. BOLWELL:  Yes, Your Honor.

6          THE COURT:  We record this.

7          MR. BOLWELL:  Yes, Your Honor.

8          THE COURT:  All right; thank you.

9          All right.  Today, do you wish a preliminary

10  examination for your client?

11          MS. MARR:  I'm sorry, Your Honor.  I was looking at

12  papers.

13          THE COURT:  I know, you're rushing.  Okay, take a

14  second.

15          MS. MARR:  May -- will you please repeat what you

16  just said?

17          THE COURT:  Would you like a preliminary examination,

18  or do you wish to waive that?

19          MS. MARR:  I'll waive that, Your Honor.

20          THE COURT:  All right.  Because your attorney has

21  waived the preliminary examination, I find, based on the

22  complaint and warrant, and things that I have already reviewed,

23  that there is enough evidence to hold you over for trial.  You

24  can prove your innocence at a later time.  This is not your

25  court date.  This is not your final adjudication.

1          All I'm trying to see is whether you should even be

2   sitting here.

3          This is also a time when we consider bail.  Counsel,

4   do you have any recommendations?

5          MS. MARR:  Your Honor, my client has been fully

6   cooperative throughout this process.  I understand that usually

7   there is a pretrial risk assessment performed; was that done?

8          THE COURT:  That was done.  Pretrial Services has

9   issued a risk assessment.

10          MS. MARR:  I have not seen that.

11          THE COURT:  Do we --

12          MR. BAKER:  Your Honor, it was emailed --

13          THE COURT:  Okay.

14          MR. BAKER:  -- to counsel, and I also have copies

15   here.

16          THE COURT:  All right, they're going to give you a

17   copy.

18          MS. MARR:  Thank you.  Your Honor, may I have a

19   moment.

20          THE COURT:  Take your time.

21                    (Pause)

22          THE COURT:  The government has had an opportunity to

23   look at the Pretrial Services report.  Do you have argument you

24   wish to make?

25          MS. ROTELLA:  Yes, Your Honor.

6

1          THE COURT:  All right, I'm going to wait then.

2                    (Pause)

3          MS. MARR:  So, Your Honor, after reviewing the

4  report, it appears that the Pretrial Services is recommending

5  $100,000 own recognizance bond with Pretrial Services, as well

6  as other conditions.  We have no objection to that.

7          This is a case where my client has no prior record.

8  He was fully cooperative.  He went in with counsel and met with

9  the Philadelphia Police.  He -- he obtained counsel.  You know,

10 he has counsel for this case.

11         I understand in the government's motion for pretrial

12 detention that they were asking for -- or that they are talking

13 about facing possible life imprisonment.  This case hasn't gone

14 that far yet, obviously.  And the allegations regarding the --

15 from the complaint for the production of child pornography are

16 ones that I believe he will have a potential defense for in

17 terms of a trial on the matter.

18         So -- and it would be much more beneficial for him to

19 be able to cooperate with counsel.  His daughter and her

20 husband are in the courtroom, that have stated that they would

21 -- that he could live with them.  The son-in-law has a job that

22 my client can do, so he can work, and he can obtain funds so

23 that he can continue to have private counsel.

24         This case started out as a Philadelphia stalking-type

25 case, and then turned into what you have before Your Honor

7

1  today.  But I would like to be able to be here, and represent

2  my client, and it would just be so much easier and better for

3  him in preparing a defense for himself if he is able to be in a

4  position to assist counsel with that defense, because this

5  really came up within a week.  This isn't some investigation

6  that's been going on where, you know -- I mean, the week -- we

7  were there before the parade, and now here we are.

8          And I understand the process has happened quickly,

9  and I appreciate that the detention hearing happened so

10  quickly.  However, I think that release in this case is

11  warranted, as opposed to the presumption that is argued by the

12  Commonwealth in terms of the potential incarceration in this

13  case.

14          THE COURT:  All right.

15          MS. MARR:  Thank you.

16          THE COURT:  This is the federal government, not the

17  Commonwealth --

18          MS. MARR:  Oh, I'm sorry.

19          THE COURT:  -- making the allegations.

20          MS. MARR:  I'm sorry.

21          THE COURT:  That's okay.

22          MS. MARR:  I was just on a conference call and --

23          THE COURT:  You're usually -- yes.

24          All right, I'll hear from the government now.

25          MS. ROTELLA:  Your Honor, the case is much more

1  serious than what's just been discussed here before the Court.

2         The allegations in this case are in federal court.

3  The charge that he is facing now, which is manufacture and

4  attempt to manufacture of child pornography carries a 30-year

5  stat max.  But most significantly, it carries a 15-year

6  mandatory minimum.  In this district, I can't think of one

7  time that we have waived the mandatory minimum.  And so he

8  faces a certain and significant prison sentence upon

9  conviction.

10        He is -- the facts underlying the case are extremely

11  disturbing.  The child -- it was first started because the

12  child was walking home from school and was approached by the

13  defendant, and -- who she did not know at that time.  He handed

14  her a handwritten, very sexually explicit, very disturbing

15  letter, and then walked away.

16        And when -- the child read the letter; gave it to her

17  mother.  The mother contacted the police.  And excerpts from

18  the letter were put in the government's memorandum to -- or

19  sorry, motion to detain him.  And the letter was much longer.

20  The letter included reference to eight of her friends that he

21  had also been spying on, with their true first and last names.

22  It was very sexually explicit.  He admitted in writing in his

23  letter that he had been watching her and recording her in

24  sexually explicit positions.  He made comments himself about

25  sexual acts.

1   He, of course, signed the letter saying, "I still
2   think you're very sexy and beautiful," all under the guise of
3   him trying to help this victim, saying that -- posing as a
4   special investigator, which, of course, he is not.  And saying
5   that he could help her, but she couldn't tell the parents, and
6   she couldn't tell law enforcement.  All in an effort to try to
7   get her to meet up with him person-on-person.

8   Because what the investigation later determined, of
9   course, is that he had been stalking her for well over a year.
10  That he had been -- he lives across the alleyway from this
11  child.  His house can look directly into this child's bedroom,
12  and that's, in fact, how he was manufacturing this child
13  pornography, and the images that were recovered show that.

14  He had been videotaping her, recording her,
15  photographing her as she was in her bedroom, in various states
16  of dress, zooming in on some images.  There are numerous images
17  that qualify as child pornography because they depict her
18  vagina, and other parts of her body, naked body.

19  And then culminating in him stalking her online
20  accounts, her Twitter account, her Snapchat account.  He found
21  out her true name.  He knew where she went to school.  He knew
22  what sports she played.  He knew her schedule.  He would
23  photograph her.  In addition to all the sexually explicit
24  images that were found on his cell phone, that he admitted was
25  his, they also found images where he was walking behind her and

1  recording her as she was simply walking home from school.  He

2  was videotaping her going into her house.  So, seemingly

3  innocuous, but his phone was loaded with these things.

4        And there's also -- the history on the phone shows

5  that he was -- where his location was, and that he was, in

6  fact, stalking this child.

7        And so that alone warrants his detention in this

8  case, because there is no way to eradicate the danger that he

9  poses to this child, or to any other that he may eventually

10  have a fixation with.

11        But in addition to that, the phone that is at issue

12  here that belonged to this defendant was seized by way of

13  search warrant by the Philadelphia Police Department, and then

14  they got another search warrant to review the phone.  The FBI

15  also participated in that review, and they confirmed all the

16  images that I just talked about with this 14-year-old victim.

17  But they also found over a thousand images of child

18  pornography, mostly prepubescent children, kids who had not

19  reached puberty, children who are -- have already been

20  identified that were easily recognizable by this agent who sits

21  with me, Agent Leslie Trawick from the FBI, and images and

22  videos depicting sadistic torture of these children as they're

23  being sexually abused.

24        So, he's well entrenched in the underworld of child

25  pornography, and has demonstrated that he is more than willing

1  to center in on one child victim, and to reach out beyond the

2  confines of his own home, to stalk this child, and to, in fact,

3  approach her and try to get her to meet up with him.

4        I should also indicate there was almost -- I laid it

5  out in the motion, but there was, like, a -- almost a year's

6  time that went by.  During the time that he was filming her in

7  these sexual positions in her house and also, you know,

8  outside, he was putting a mask on his face so she wouldn't be

9  able to see what was and from the own -- his own home, he would

10 flash a flashlight up into her bedroom window, and he'd be

11 masturbating.

12       And so part of the masturbation, part of the sexual

13 gratification for this defendant was to have this child look

14 over and be scared that somebody was out there masturbating.

15 And that continued.  That was all part of the harassment, the

16 stalking, the sexual victimization of this child, and it all

17 goes into the danger that he poses if this Court were to

18 release him.

19       And so let me just talk a bit about the Pretrial

20 Services.  I have worked with Michael Baker for many years from

21 Pretrial Services.  This is not an indictment of their --

22       THE COURT:  Ms. Marr, you may be seated, because she

23 seems to be going to go for a while.

24       MS. MARR:  Thank you; I apologize.

25       MS. ROTELLA:  This is not an indictment of their

1    agency, Your Honor, or the -- nor the author of the report, or

2    anything of that nature.  But this recommendation in no way

3    addresses the presumption that he is a danger, the presumption

4    that he's supposed to be detained because he's a flight risk.

5    It doesn't address it.

6          THE COURT:  I think it --

7          MS. ROTELLA:  An OR bail --

8          THE COURT:  It has 17 points.  Usually we have ten,

9    at most.  So, they did give it extra attention.

10          MS. ROTELLA:  No, no, and I recognize that.  They

11    did, yes, because the main thing here that they're looking for

12    is location monitoring.

13          But I ask the Court to consider this, which is what I

14    filed as part of my memo.  Their powers are very limited, and

15    Officer Baker will admit that to this Court; he and I have

16    talked many times, including before this hearing.  Their powers

17    are limited.  They cannot search a person's home.  So, they

18    are complete -- if -- if you have computer monitoring, for

19    example, we're going to monitor his cell phone to see he's not

20    accessing child pornography.  It's completely reliant upon this

21    defendant reporting to Pretrial Services, "This is my only cell

22    phone."

23          Because, of course, if he should go out to buy

24    another cell phone, if he would have Amazon deliver him another

25    cell phone, if he were to hide a cell phone simply by sticking

1  it in a drawer, Pretrial Services cannot search the house.

2  Even if they were to find the unauthorized cell phone, which I

3  don't know how they would, unless he left it right open in the

4  -- on the, you know, desk, even if they were to find an

5  unauthorized cell phone, they are not permitted by their own

6  rules to seize the cell phone.  They're not permitted to look

7  through the cell phone.  They're not trained forensically on

8  how to not alter original evidence on any kind of device that

9  they may find.

10         And that's not an indictment of their agency, but

11  they are their rules, so they have to live by their rules.

12  It's inadequate -- the nature of these charges, including his

13  downloading of these images from the Internet, and his use of

14  his phone, and his use of, excuse me, electronic equipment to

15  commit these crimes, the nature of these crimes makes them

16  extremely difficult to eradicate the danger that still exists

17  to children if he were to be released because of the limited

18  power of Pretrial Services.  It's wholly inadequate in this

19  case.

20         And I would say to the Court, in -- I would say in

21  the last ten years that I've been supervising these cases, I

22  can't think of one defendant who was charged with this offense

23  that has ever been released.  I will say that we have the other

24  half of Probation, the supervising probation officers, contact

25  me repeatedly, multiple times a month for people who are on

1  probation being supervised, convicted offenders, who are

2  violating by continuing to access devices that they've not

3  reported to their probation officers.  Unlike Pretrial

4  Services, those probation officers can search the materials;

5  can look through the phones; are trained in how to make sure

6  that the evidence is not destroyed.

7            We do not have that here.  And for that reason, the

8  demonstrated danger that he's posed to this child, to all the

9  other kids that he's victimized as part of his Internet crimes

10 mandates that he should be kept incarcerated while pending

11 trial.

12           THE COURT:  All right.  Ms. Marr?

13           MS. MARR:  Yes.  Your Honor, may I just respond

14 briefly?  My client is 58 years old.  He's never been in

15 trouble in his life.  The allegation regarding this young lady

16 is they were neighbors, and there is -- the allegation and the

17 facts are that my client is in his home, and this young lady is

18 in her home in her window -- and I've seen the pictures because

19 we went in, in her window in front of her window naked, knowing

20 that my client's home is right there with an open window, or

21 potentially open window.

22           My client never -- he does have pictures of her on

23 the street, but -- and also this -- this young lady is 14.  I

24 know for purposes of production of child pornography from the

25 federal statute and the federal case law that mistake of age is

1 | not a defense, but this is a -- it's a stretch of a case for --

2 | for production.  And ultimately, this girl was 14, and my

3 | client clearly did not know how old she was.

4 | Over a year went by, according to the AUSA, there was

5 | no contact.  And I have to take umbrage with the fact that she

6 | says that my client was going to -- attempting to meet with

7 | her.  He said, you need to talk to me.  The word was "talk."

8 | Did not say meet.

9 | Part of the thing with production, and the fact that

10 | age of the victim doesn't matter is because the idea is that

11 | person that produced the child pornography met with the child

12 | and, you know, induced, and got the child to take off the

13 | clothes, and had all this contact, which would indicate that

14 | you know that that child is a minor.

15 | In this case, you've got my client in his house, this

16 | young lady in her house.  He never spoke to her one time.

17 | There's no talk.  There's no texting.  Other than him handing

18 | her the letter, and I believe that he admitted that he said,

19 | you know, you might want to -- you might want to read this in

20 | private.  So, he said that to her.  She -- I believe she said,

21 | okay.

22 | So, other than that, he specifically did not know her

23 | age.  He knew she played soccer.  I think he knew what school

24 | she went to, but she could be 18 in high school and playing

25 | soccer, and all of that.  She's fully developed.  She's not

1  prepubescent.

2        And the place where he would live, and I think this

3  is most important, with his daughter is far away from this

4  neighborhood.  His house is already -- the intention is to sell

5  his house.  And with him being in custody, all of that -- he's

6  not able to obtain legal fees.  He's not able to work.  He's

7  not able to sell the house.

8        Also, in terms of what pretrial supervision can do

9  and not do, his daughter cares enough about him.  She has no

10  children, she's 28.  She's here, you know, with her boyfriend

11  before Your Honor, taking the time off from work to be here to

12  say, yes, I will, you know, be -- my dad can live with me.

13        Are they going to watch every move?  Is anybody going

14  to be able to watch every move?  No.  But my client didn't even

15  have a computer.  He doesn't have a computer in his home.  He's

16  not computer literate.  The most he has is a cell phone.

17        A lot of these child pornography cases, there's

18  BitTorrent, and there's ShareFiles, and drives, and software.

19  He knows none of that.  There was none of that.  It was just

20  his cell phone.

21        And there's been no admission regarding the images

22  that were found on the cell phone.  He lived with his brother.

23        But in terms of this young lady, this young lady is

24  safe, she's protected.  He did not proposition her in that

25  letter.  He did not say, meet up with me, I want to get with

1  you.  Was it a sexually motivate or a -- was it a letter having

2  a lot of sexual content?  Yes.  But it was things that he saw

3  either her doing, because she was doing it in front of an open

4  window -- like, he never went up to her house and looked in.

5  It was from his window.

6         So, I'm not trying to bash the victim here.  She's a

7  14-year-old girl.

8         But what I have here is a 50-year-old -- 58-year-old

9  man that's never been in trouble in his life, and he's charged

10  with extremely serious offenses.  He has potential defenses.

11  He's been fully cooperative.  He has a place to live where the

12  victim involved in this case would be nowhere near him.  And

13  there's no other evidence that he ever did chat rooms or

14  reached out to any children.

15         Not everybody should be incarcerated on these

16  charges.  I know about the presumption, but you have the

17  ability to overcome that.  I've had other cases in other

18  districts where, you know, people had two -- a specific

19  individual had 2,000 images of baby, and infant, and toddler

20  pornography, and was released on pretrial supervision, and was

21  a computer expert.  So, I personally went to the house and

22  removed, like, nine hard drives and computers so that -- and

23  routers and things so that he wouldn't have access so we could

24  go home to his house.

25         So, people do get released.  And this is a case where

1  I am pleading with Your Honor that it is appropriate for his

2  release so that he can defend himself.  He's not convicted yet.

3          Thank you.

4          MS. ROTELLA:  Can I just respond very briefly, Your

5  Honor?

6          THE COURT:  Yes.

7          MS. ROTELLA:  The two things that counsel represented

8  were defenses are actually not legally cognizable defenses to

9  this charge.  Consent, whether she was in the window showing

10 the whole world is not a defense to manufacture child

11 pornography ever; it's precluded.

12         Neither is mistake as to age.  The government doesn't

13 have to prove that he knew the age that she was, that she was

14 only 14 years old, and in the eighth grade.

15         The fact that she is only 14 years old is sufficient

16 for a conviction on this charge.

17         So, both of those defenses that were mentioned cannot

18 factor into this because they're not legally cognizable.

19         I would also say, I think -- counsel keeps mentioning

20 the boyfriend is in court, who he would be living with.  That's

21 not his boyfriend, it's his brother.  He was living with his

22 brother at the time of these offenses and still committing

23 these offenses.

24         MS. MARR:  Oh, I apologize.  I thought that that was

25 a -- I apologize, Your Honor.  I didn't realize that that was

 1  my client's brother and not the significant other.

 2          MS. ROTELLA:  And I --

 3          THE COURT:  Are there other people here to support

 4  this client today?

 5          MS. MARR:  Excuse me?

 6          THE COURT:  Are there other people here to support

 7  the client today?

 8          MS. MARR:  Just his daughter in the back row and his

 9  brother, who I didn't realize, because we met quickly, was his

10  brother and not her significant other.  But her significant

11  other is the one that has a job for him, and I believe she

12  brought evidence of that, as well, a letter that he would

13  employ him if he were released.

14          MS. ROTELLA:  Just --

15          MS. MARR:  But I apologize for that incorrect

16  statement.

17          MS. ROTELLA:  Two more things.  The one -- one other

18  thing is that the address that they're advocating where the --

19  I don't know -- the boyfriend may live is close in proximity to

20  a school.  So, I don't know how that would work, because he

21  would have access to -- it's one mile from an elementary

22  school, and five miles from a high school and another middle

23  school.  So, there's three schools that are at issue right

24  where they're proposing that he now move to.

25          And in terms of the other proofs, which I -- is laid

20

1 out in the memo, he did confess.  He did confess, not just in

2 this written letter to manufacturing child pornography, but he

3 came in, was Mirandized; his lawyer was with him.  He did

4 confess to manufacturing child pornography to FBI agents and to

5 the Philadelphia Police Department.

6          And then he was shown printed out photographs from

7 what was taken from his phone that depicted the child victim in

8 sexually explicit positions, and he acknowledged that he

9 manufactured those.

10          So, conviction here is very, very high.  The

11 penalties are very, very high.  He will be in prison for a

12 significant amount of time.

13          He poses an extreme danger.  And there's just no

14 justification to release him.

15          THE COURT:  Would you concede that he is likely to

16 show up for trial?

17          MS. ROTELLA:  I mean, I can't concede that.  I admit

18 that that's not as great a basis to hold him.

19          THE COURT:  I just wanted to focus my attention on

20 your argument of danger if --

21          MS. ROTELLA:  Yes.

22          THE COURT:  -- there's no real issue as to whether or

23 not he would at least come to court.

24          MS. ROTELLA:  I mean, the only reason why I would say

25 that, Your Honor, is because although he's got some -- you

1  know, he has a daughter here, and he's got a brother here.  He

2  also faces a significant -- much of the rest of his life, he's

3  older, in prison.  And so that does give, you know, people --

4  and he's got a mental health history.

5          And so for those reasons, I can't say that that --

6  that has been rebutted.  I still think it presents a factor

7  here.

8          THE COURT:  All right.  Anything else you want to say

9  before I make my ruling?

10          MS. MARR:  Thank you, Your Honor.

11          Just to the extent that when he was contacted by the

12  police, my client had every opportunity to destroy his phone.

13  He went home and met with the -- and met with the police.  They

14  executed the search warrant.  He's been fully cooperative.  He

15  showed up for the police.  He hired private counsel.  He

16  admitted to certain things.

17          Again, I believe that there are some issues in terms

18  of the manufacturing aspect of the charge, but I will, you

19  know, argue that on another day.

20          But he -- there -- I don't believe there's any issue

21  with him not showing up.  He's not a world traveler.  He's got

22  a 10th or 11th grade education.  He's not somebody that's got -

23  - that's been traveling overseas that has out-of-the-country

24  contacts.  He's not from Ecuador, or something where he's just

25  going to go to some other country.  That's not even in his

22

1   wheelhouse.

2          So, I don't believe that's an issue.  And I believe

3   that the matter of the safety has been addressed.  If he's got,

4   you know, a GPS monitor -- you know, he's always lived by a

5   school.  For -- you know, he's lived in the Bridesburg area his

6   entire life of 58 years.  He's grown up there.  So, he's always

7   been by schools, having that access.

8          So, the idea that now he would be under indictment

9   and facing federal charges, that he would now choose to, "oh,

10  let me go to a school and reach out to a child" is insane

11  because if he was going to engage in that behavior, he never

12  did it over 58 years, other than these allegations regarding

13  this young lady.  And we know to the extent that that occurred,

14  and he would be nowhere near her with all of -- with the

15  supervision.

16         And -- and I believe, Judge, how's he going to defend

17  himself if he's incarcerated all this time?  It just makes it

18  nearly impossible.

19         MS. ROTELLA:  That's --

20         MS. MARR:  Thank you.

21         MS. ROTELLA:  That's not a proper consideration, it's

22  not.  And every other defendant in this district somehow finds

23  a way.  It makes it more difficult for counsel, but that's not

24  a proper consideration for detention.

25         THE COURT:  All right.  I've listened to the

23

1   argumentation.

2           I have two things I'm supposed to determine in

3   setting bail:

4           One is, will the person show up for court?  I find

5   that it looks and appears that he would be cooperative and show

6   up when he's summoned to do so.

7           But the second thing that I have to consider is

8   whether or not he's at any safety risk presently for the

9   community at large.  Not to a specific individual, but in

10  general.

11          They have put 17 restrictions on him.  I have had

12  other cases in this court where, as you stated, besides having

13  restrictions, they have still gone into computers and done

14  things to access underage people.

15          It is not a defense, as was stated, to not know the

16  age of the child, or that she participated willingly in doing

17  things that provoked his interest.

18          This is a very serious incidence of stalking.  He's

19  facing a 15-year mandatory minimum, so there -- this is a

20  presumption case.  And the government has shown a lot of strong

21  evidence, including the fact that he debriefed with law

22  enforcement, stating, yes, he did these -- or certain things.

23          That strength of evidence helps to give them their

24  presumption and preserve it.  You have to overcome that

25  presumption.  And you've done well.

1       However, I find that he's a risk to minors and young

2   ladies who live in the area.  He would be moving to an area

3   where he'd be near three schools.  And that -- I do not believe

4   that him being detained will interfere with his ability to sell

5   his house, because you usually do that through a realtor and

6   people who are at liberty to do and move about as they choose.

7       So, you should be detained until the time of your

8   trial.  At that time, you can defend yourself and state what

9   you believe the circumstances are here, and the District Judge

10  will take that into consideration.

11      This is on a complaint and warrant, so I don't have a

12  District Judge yet.

13      Anything further for court this afternoon?

14      MS. ROTELLA:  No, Your Honor; thank you.

15      THE COURT:  Hearing nothing, court is adjourned.

16      (Whereupon, at 2:18 p.m., the hearing was adjourned.)

17

18                    CERTIFICATE OF TRANSCRIBER

19      I, KAREN HARTMANN, a certified Electronic Court

20  Transcriber, certify that the foregoing is a correct transcript

21  from the electronic sound recording of the proceedings in the

22  above-entitled matter.

23      /s/ *Karen Hartmann*

24  Karen Hartmann, AAERT CET 475  Date:  March 18, 2025

25  TRANSCRIPTS PLUS, INC.