**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA     :

        v.          :     **CRIMINAL NO. 25-083**

DAVID BOLWELL        :

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

Defendant David Bolwell stands before this Court for sentencing for his surreptitious photographing and video recording of a 14-year-old child through her bedroom window for a period of approximately three years, his production of hundreds of sexually explicit images of this child, and his collection of more than 1,200 images and videos from the Internet depicting the most depraved sexual abuse against the youngest of child victims, which he amassed for well over a two-year period during the same time that he was stalking the 14-year old victim.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir.

1

2006). At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

## I.    <u>PROCEDURAL BACKGROUND</u>

On March 11, 2025, the defendant was charged by the federal grand jury with manufacture and attempted manufacture of child pornography, in violation of 18 U.S.C. § 2251(a) (Count One) and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) (Count Two). On May 28, 2025, the defendant entered a guilty plea to Count One of the indictment.

Sentencing is set for October 31, 2025 before this Court.

## II.    <u>FACTS OF CONVICTION</u>[1]

On February 3, 2025, the 14-year-victim reported that she was walking home from school when an unknown man approached her from behind, called her by name, and handed her a handwritten, sexually explicit letter, whispering to her "open it in private." Though the victim did not know this defendant, the letter was addressed to the child's true first name. The child did not

---

[1] The facts recited in this sentencing memorandum are the same as those contained in the government's Change of Plea Memorandum, to which the defendant stipulated at the time of the entry of his guilty plea. These same facts are also recited in the Presentence Report (PSR), to which the defendant has filed no objection.

open the letter and instead turned it over to her mother, who then contacted Philadelphia Police

after reading its contents. The following is a sample from the hand-written letter:

> Hi [child's true first name], I'm writing this to you to let you know that I am an independent Special Investigator. I know many things about you and wanted to let you know that you could be in some pretty serious trouble. I have obtained many many photos and videos of you having group sex parties with most of your girlfriends and a few older men during your so called sleepovers. I know the truth and these pictures from your phone and other electronic devices don't lie. It seems to me that you are a very sexually active and extremely horney young girl. I know that you are frequently watching internet porn as well as what you are doing on Snapchat…sexting and sending and receiving naked selfies to your friends and older men. Sometimes even doing split-screen webcam shows while masterbating, which I know you love doing 3-4 times a night. Constantly humping your bed and playing with yourself and pinch-pulling on your little nipples. These pictures even show you giving and receiving oral sex with your different girlfriends and older men. Some of these pictures even show you letting your girlfriends suck on your tits and pics of you giving a blowjob to an older bald man. And even you jerking some guys off…..I can help you out but your really going to have to talk to me. Otherwise if your parents or the authorities find out you could be in trouble. Despite all of this I think you are so sexy and absolutely beautiful."

*See* Exhibit K. The defendant signed the letter with the nickname, "Flash." In the letter the

defendant provided information that demonstrated he knew intimate details of this child's life:  he

named eight of this child's friends by first and last name in the letter, and he told her he knew more

of her friends from her school and soccer.

      During her interview with members of the Philadelphia Police Department (PPD) the child

described a pattern of disturbing incidents that began around Halloween 2024, where an unknown

man would shine a flashlight into her bedroom window repeatedly. The most recent incident was

two weeks prior, when the man from the same home shone a flashlight into her bedroom window,

and when she looked out of her window she saw him in the second floor bedroom of his house,

wearing a mask and masturbating. The child's brother took a picture of the man but they did not report the incident to their mother or the police at that time. After receiving the letter, however, she advised PPD of these incidents and pointed out the home, which was the defendant's residence at 4432 Edgemont Street in Philadelphia. The photo array assembled by PPD did not result in a positive identification by the victim.

Subsequent investigation by Philadelphia Police confirmed the identification of the defendant. Police obtained video footage from a ring camera in the neighborhood that shows the defendant lying in wait for approximately 20 minutes, and when the victim neared her home he got out of his truck and handed her the letter then went into his own home at 4432 Edgemont Street. Philadelphia Police then obtained a search warrant for the home, which was executed on February 6, 2025. The defendant was present at the time of the execution of the search warrant, and police seized a Samsung Galaxy S23 smart phone, Model SM-S911U bearing serial number 355123544810014 from the residence. The defendant was not arrested at that time.

A second search warrant was obtained by PPD to search the contents of the seized cell phone. Forensic review of the phone was later conducted by the FBI, which revealed the following:

1. **More than 3,800 images of the child victim**, most of which were taken of the child through her bedroom window, from the defendant's vantage point from outside of her home. All of the images were stored in either the Photo Editor or the Samsung Clipboard.[2]

---

2 The Photo Editor feature allows users to easily edit and enhance their photos on their Samsung devices. There were dozens of images of the child victim found in the Photo Editor which show that the defendant zoomed in to create frames of the victim's body and buttocks, as well as her cell phone screen. The Clipboard is a temporary storage area for copied or cut content (text, images, links) that can be pasted into different apps or contexts. Both the Photo Editor and Clipboard are temporary storage spaces.

- Approximately 448 of these images constitute child pornography within the meaning of 18 U.S.C. § 2256, and were manufactured by the defendant from December 17, 2023 through January 29, 2025, as follows (Count One, manufacture and attempted manufacture of child pornography):

  o 129 images where the child's vagina is exposed. In all but 17 of these images the child is fully nude.

  o 73 images which depict the victim appearing to be masturbating, with her hand down her pants or touching the outside of her pants or underwear.

  o 246 of the images were taken in sequence with the CP images but do not depict genitals or masturbation.

- Hundreds of images show the victim changing her clothes, using her cell phone, or walking in her bedroom. Many are zoomed into the child's face.

- More than 130 images that depict the child victim in her bedroom with her friends. Some show the victim and her friends laying on her bed. The children were all clothed in these images. The metadata for these photos show they were taken between March 16, 2024 and January 27, 2025.

- At least 22 images taken between April 5, 2024 and July 25, 2024 demonstrate that the defendant was stalking this child even outside of

her house, as he photographed her walking on the street, in her own yard, or entering her home. She is carrying her school backpack in every one of these photos.

2. **At least 300 additional images** of minor girls that appear to have been taken from online social media accounts. The two primary girls in these 300+ photographs are the victim's friends, both of whom were named in the letter the defendant wrote to the victim.

3. **More than 1,200 additional images of child pornography taken from the Internet**. These images depict mainly prepubescent children who were being orally and vaginally raped by adult men, engaged in sexual activity with other children and in acts of masturbation, and lasciviously displaying their genitals. At least 17 depict sadistic and masochistic conduct, to include minor girls being sexually abused by animals or with rope binding their arms and legs. These images were all found in the Photo Editing and Clipboard on the phone. Metadata for these images shows that he was viewing these images from at least December 3, 2023 through February 5, 2025 - during the same time that he was stalking and surreptitiously recording the 14-year old victim. (Count Two, possession of child pornography).

4. **User history includes:**

   - An Instagram account registered to David Bolwell but with a username of "DBRAZOR1," which was following user [name omitted to protect minor] - one of primary girls of the victim's friends whom the defendant

also photographed (see above) and whose name he included in the letter to the victim.

- Web history which shows he accessed the victim's Facebook and Twitter accounts.

5. **Attribution data** on the phone connects the defendant to the device, in that the Chrome Autofill identifiers were in the name of "David Bolwell," and his correct address of 4432 Edgemont St in Philadelphia, 19137.

On February 12, 2025, the defendant and his attorney appeared at the Special Victims Unit of the Philadelphia Police Department and agreed to be interviewed. Before the interview the defendant was advised of his Miranda rights with his attorney present. His attorney remained with him throughout the interview. During the interview, the defendant told investigators that he had been using the flashlight on his phone for well over a year to "communicate" with the victim, whose first name he knew even though he had never met her. He described five times - all of which he claimed were initiated by the victim - in which they both used their flashlights to let each other know that they could be seen. He admitted to masturbating during at least two or three of these incidents but claimed not to have done it on purpose for the victim to see. He also admitted that at one point, for about a month, the child put a piece of cardboard in her window to block his view and also closed her curtains, but that he continued to watch her and could still see her walking in her bedroom. She later removed the cardboard, and the defendant claimed that she used to come to the window, fully naked, and flash her light to alert him to her presence. In his opinion, he believed that she was "taunting" and "teasing" him by flaunting herself "naked" in front of the

window for him to see. Significantly, he explained that he signed his letter "Flash" because he believed the victim would then know who he was.

He admitted to seeing her breasts, vagina, buttocks, and naked body through her bedroom window, and photographing and video recording her using his Samsung cellphone that had been seized as part of the search warrant. The defendant admitted that some of the photos and videos he took depicted the child nude, including showing her genitals. He estimated that he recorded her at least 30 times. The defendant was shown several photographs taken from the forensic examination of his seized phone which depicted the 14-year-old victim's vagina, and he admitted to taking those photographs while the child was in her bedroom.

The defendant claimed to have taken the photographs and videos to "find out who she was" and to "see what her girlfriends were doing." He further told investigators that he had written the letter to the victim and delivered it to her in person to let her know that he had the pictures and videos and to "help" her so that she did not get in trouble with her parents. He told investigators he had a 27-year-old daughter of his own, and he had "fatherly" feelings of concern for the victim (though he had admitted earlier in his statement that he was a "single guy" and was attracted to naked girls and took photos of the victim because she was a "cute girl" and he liked seeing her naked.) He claimed not to know the victim's true age.

He advised investigators that he had deleted everything from his phone after his brother showed him online group posts from the Bridesburg neighborhood where they lived where someone had posted a photo of the defendant taken from the ring camera and called him a child molester. The defendant got spooked and decided he should delete his collection, which is consistent with where the images were found on his cell phone during the forensic examination.

8

When questioned about his collection of thousands of sexually explicit images and videos of other children that had been taken from the Internet, his attorney advised that the interview was terminated. He was then arrested at the conclusion of his statement.

## III.    SENTENCING CALCULATION.

### A.    Statutory Maximum and Mandatory Minimum Penalties.

**1.    Manufacture/Attempted Manufacture of Child Pornography, 18 U.S.C. § 2251(a)(1) (Count One)**

30 years' incarceration with a 15-year mandatory minimum term, a minimum 5 years up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution pursuant to 18 U.S.C. § 2259 of at least $3,000 per victim, and if found to be non-indigent, an additional, mandatory $5,000 assessment must be imposed pursuant to 18 U.S.C. § 3014, and another special assessment of up to $50,000 pursuant to 18 U.S.C. § 2259A(a)(3). Forfeiture of the property used in the commission of these offenses will also be ordered.

**2.    Additional Penalty:**

The defendant also faces additional, mandatory restitution of at least $3,000 per victim for the children identified as the basis for the possession of child pornography charge in Count Two of the Indictment, pursuant to 18 U.S.C. § 2259(b)(2), (b)(4), (c)(3).

### B.    Sentencing Guidelines Range Calculation.

The defendant's Guideline calculation for his manufacturing of child pornography crimes resulted in a total offense level of 36 and a Criminal History Category I, for a final Guideline range of 188 to 235 months' incarceration. The details of the calculation are as follows:

| Guideline | Base Offense Level, USSG § 2G2.1(a) | 32 |
|---|---|---|
| | Minor under the age of 16 years, USSG § 2G2.1(b)(1)(B) | +2 |
| | Repeat and Dangerous Sex Offender, USSG § 4B1.5(b) | +5 |
| Adjusted Total | | 39 |
| Less, Acceptance | | -3 |
| Final Offense Level | | 36 |

| Crim History | | Category I |
|---|---|---|
| **Guideline Range** | | **188-235 months' incarceration, with 180 months MM** |

## IV.    <u>ANALYSIS.</u>

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### Consideration of the 3553(a) Factors.

### A.    The Nature and Circumstances of the Offenses

The defendant's manufacturing crimes against the 14-year-old child victim are abhorrent. By his own admission in his letter, he stalked this child for more than three years, surreptitiously photographing and video recording her day after day. *See* Exhibit J at 3 ("I know that these things have been going on now for over three years.") He amassed an enormous collection of thousands of images and videos – more than 3,800 over the extended time that he stalked her. Almost 450 of these images and videos constitute child pornography, as they depict her exposed vagina or fully nude. Many of the images and video had been edited by the defendant, most times to zoom in closer to her genitals. In short, the defendant committed hundreds and hundreds of crimes against this child, over many years. This factor alone warrants a severe sentence at the top of his Guideline range. § 3553(a)(1).

Above and beyond the sexually explicit images and videos he recorded of the victim, there were thousands that the defendant surreptitiously filmed which depicted all aspects of her life: invading her privacy by filming her through her bedroom window, recording her as she changed her clothes, got ready for bed, and when she was laying in bed and looking at her phone the defendant zoomed in so he could see her cell phone screen. He recorded her as she did things that every 14-year old girl does, such as dancing in the mirror, hanging out with her friends in her bedroom, trying on different outfits. He stalked her for so long that he knew her school

schedule, and would leave his house in the morning when she was walking to school and again when she returned home in the afternoon so that he could surreptitiously photograph and video record her. He took pictures of her in her own backyard. He stalked her online social media accounts, and, after learning who her friends were from those online accounts, he then amassed a collection of hundreds of images of two of her friends that he took from their online accounts.

Not content with allowing his presence to remain unknown, the defendant began to reach out to the victim (albeit without revealing his identity) by shining a flashlight into her bedroom window from his bedroom window. At times he would masturbate with the window open after flashing the light while wearing a mask to disguise his face. He frightened this child so much that she told her brother what was happening and slept on his bedroom floor to avoid any chance of being seen. She covered her window with cardboard for weeks. That served little to deter this defendant, however, as he continued to watch her, night after night, photographing her bedroom window even when the cardboard prevented him from being able to see inside. As soon as the child thought enough time had passed and she removed the cardboard, the defendant's stalking continued unabated.

After years of stalking this child and surreptitiously recording her, the defendant was no longer satisfied with remaining anonymous. He drafted a letter to this child, and set out to meet her in person. Recordings taken from the street where the child lived show that he sat in his truck for almost an hour waiting for her to walk home from school. And when she passed by him this 58-year old man approached her, handed her his handwritten letter which was addressed in her true name, and instructed her to "open it in private." She instead brought it inside and gave it over to her mother. The contents of the letter are extremely disturbing: the defendant claimed to

be an "independent [sic] Special Investigator" who needed to speak with her in person to help

her from getting into "some pretty serious trouble." He named eight of her friends in the letter,

and talked about her school and her soccer team. He also spoke to this child using extremely

sexually graphic terms, and most frightening, made it clear that he had been watching,

photographing, and recording her for more than three years.[3] His victimization of this child – and

the length of time he subjected her to it - warrant the sentence called for by his calculated

Guideline range. § 3553(a)(1).

The defendant's crimes have lasting impact on the child victim and traumatized her

whole family. As her mother details in her letter to this Court,

> [The defendant's letter] was a gift of fear to us all.  The unwanted, unsolicited gift of fear - the fear of our daily routine, the fear of being in our home, fear to be alone.
> *****
> A home should be your safe space especially for a child, he imposed on our home creating a mentally unsafe environment….As the investigation went on things just got worse, the discovery of the pictures, videos, the knowledge that he was following her for over a year,  as parents the "what ifs" are so overwhelming.  The long-term effects of his actions have not seen the light of day yet and neither should he.

*See* Exhibit J.  As she notes in her letter, much of the trauma results from the fact that the defendant

invaded their home – the one place where a child should feel safe. The defendant has forever

altered this child's sense of peace and well being by demonstrating how easy it is to be preyed

upon in her own home. This, too, warrants a sentence at the top of the Guideline range.

---

3 It should be noted that the sexual activity the defendant claims to have witnessed the victim engaging in is wholly false and appears to be a fantasy he built up in his mind – not only does the 14-year-old victim deny these allegations, but the subsequent examination of the defendant's seized phone which revealed the thousands of images that he took of this child demonstrate that none of them depict any of the sexual activity the defendant alleges in his letter.

§ 3553(a)(1).

And this defendant's crimes involve so much more. During the same time that he was stalking the 14-year-old victim, he also involved himself in the underworld of child pornography, amassing a sizeable collection of more than 1,200 images and videos that he downloaded from the Internet for almost two years. The images and videos he collected from the Internet depict the most depraved sexual abuse of the most vulnerable of victims – virtually every child is prepubescent, and is abused through acts of oral and vaginal rape by adult men, and, in some cases, by animals. The children in a significant number of images are clearly frightened and in pain.

Child sexual exploitation crimes are undisputedly grave offenses. As the Supreme Court has explained, "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Government have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008). Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Sentencing Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003).*

In *United States v. MacEwan*, 445 F.3d 237 (3d Cir. 2006), the Third Circuit upheld the defendant's sentence for distributing and possessing child pornography based, in large part, on the extreme harm to the children who are victims of sexual abuse:

> "In evaluating the magnitude of the harm caused by child pornography, we defer to the findings made by Congress. The congressional findings underlying § 2251 repeatedly stress that child pornography 'is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved.' Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, § 121, 110 Stat. 3009, 3009–26 (1996) (codified as amended at 18 U.S.C. § 2251). Congress found that

14

'where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years.' *Id.* **Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere 'existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children.'** § 121, 110 Stat. at 3009–27. **Furthermore, 'it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.** *Id.; see also New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.")."

*United States v. MacEwan*, 445 F.3d at 249-50. This defendant, and others like him who share in the world of child pornography, perpetuate the harm to the victims depicted in these images by creating demand and fueling this market, thereby leading to further production of images. The children are victimized every time the images are downloaded, purchased or viewed by another person. Given the scope of the Internet, their exploitation is ongoing and relentless[4]. The images of these children – their most private parts, their faces, the sexual assaults they suffered at the hands of their adult abusers - are being circulated around the world.

This Court need only read excerpts from the letters from the child victims and their families who were part of the defendant's collection to understand the significance of the harm and abuse inflicted upon these small children, all for the sexually deviant "pleasure" of people like this defendant (*See Exhibits A through I, and the excerpts below*):

---

[4] The National Center for Missing and Exploited Children ("NCMEC") identified a number of the children depicted in the defendant's collection whose images were traded all over the world.

It is impossible to cope with and accept the fact that I must live with the images of my abuse being available on the internet forever….It is nearly impossible to live with the fact that my carefree and fun childhood was stolen from me – and I am reminded of this almost daily in one way or another. That child will never be allowed to live the life that she deserved for as long as her images are being viewed. *Exhibit A* – victim in AprilBlonde series.

My childhood innocence was stolen and continues to be exploited on a daily basis by strangers. Knowing that I cannot retrieve the photos or videos, nor can I remove them from the internet and dark web makes me feel helpless and powerless….When I turned 18, I asked not to receive VNS notices because I just couldn't bring myself to confront the mountains of evidence that images of my abuse were being circulated……I realized that my decision to avoid knowing what was happening with the images of my abuse, and the ongoing crimes against me, was making my life harder, not easier. *Exhibit B* – victim Henley in BluePillow1 series.

I will live forever with the knowledge that my image is in the world and will be viewed. I will live forever with the fear of that and whether someone will  know who I am and that I will face worse than bullying. There is nothing I can do to stop this or to control what happened to me as a child. While I can move on in my life, the images and access to them will forever hold me to that time when I had no control and couldn't stop what was happening. *Exhibit F* – victim in Jan_Socks series.

These letters, and the other statements from victims and their families, detail the continuing harm they endure from having their images traded over and over again, with no end to their torture. The defendant's role in the continued victimization of these children is consequential, yet none of these crimes factor in any way into the calculated Guideline range. The crimes he committed against these young victims have earned him a sentence at the top of his Guideline range. §3553(a)(1).

### B.      The history and characteristics of the defendant

The history and characteristics of this defendant also favor a sentence at the top of his Guideline range. Though the defendant pleaded guilty in this case, his statements to the United States Probation Officer demonstrate that he still has not accepted full responsibility for his crimes.

He continues to maintain that he gave the child victim the letter "as a warning" instead of recognizing that he did so because he found her sexually attractive and wanted to have in-person contact with her. PSR ¶ 28.

Additionally, he continues to maintain that he didn't know that she was 14 years old, claiming that when he "found out" her true age he was "sick to his stomach." *Id.* This, too, flies in the face of the evidence – he stalked her social media, which was replete with postings about her middle school and her similarly-aged friends. He also talked about her soccer team in the letter, demonstrating he knew her extracurricular activities and that she was a middle-school aged student. He followed her for more than three years, meaning that she was just 11 years old and in grade school when he first began his obsession with this child. He followed her to and from school and photographed her wearing her school backpack. To continue to maintain his lack of knowledge about her age at this late stage in his prosecution should cause this Court great concern.

Third, he also denies knowingly downloading and accessing child pornography, claiming that he came upon it "by accident" and was "curious" and "went down a rabbit hole." PSR ¶ 29. He denies having any desire to "be with little girls." *Id.* Again, this is wholly inconsistent with the forensic evidence in this case, which shows numerous dates over more than two years on which he downloaded and accessed and viewed his child pornography collection over and over again. The children in his 1,200+ image collection were almost entirely prepubescent "little" girls. To deny sexual attraction in the face of uncontroverted evidence to the contrary demonstrates his lack of true accountability.

*The Defense Psychiatric Evaluation*

The defendant submits a forensic psychiatric evaluation report by John Markey, Psy.D.

(the "Markey Report") in support of a mitigated sentence. Dr. Markey interviewed the defendant at the FDC for four hours in July 2025, and conducted "testing" during the interview, most of which was self-report by the defendant in response to written questions. Based on his interview and testing, Dr. Markey diagnosed him with Major Depressive Disorder, Recurrent, Severe, With Anxious Distress. Markey Report at 9.[5]

One of the "tests" completed by Dr. Markey was the SVR-20-V2 checklist of 20 risk factors to predict future sexual violence. Markey Report at 12. Though not fully explained in his report, the process involves rating each of the 20 items, analyzing the individual's specific risk factors, and using that analysis to form an overall judgment of low, moderate, or high risk. *See* https://arizonaforensics.com/sexual-violence-risk-20/#:~:text=The%20factors%20essential%20in,Education%20and%20training. The factors to be analyzed are both static (unchanging, such as the lack of a prior criminal record), and dynamic (open to interpretation, such as whether the offender has an attitude that supports or condones sexual offending). *Id.* Dr. Markey addressed some of the factors in his report, but did not address all of them and more importantly, did not reveal his "scoring" method that led to the opinions rendered in his report. For example, in the factor addressing "chronic sexual offending,"

---

5 It is difficult to understand why Dr. Markey failed to address pedophilic disorder, when the defendant's collection of more than 1,200 images of child pornography, amassed over an extended two year period, depicted almost exclusively pre-pubescent children. Pedophilia is a form of paraphilia that causes harm to others and is thus considered a paraphilic disorder. *See Merck Manuals, Pedophilic Disorder at* https://www.merckmanuals.com/professional/psychiatric-disorders/paraphilic-disorders/pedophilic-disorder, content last revised October 2025. Pedophilic disorder is characterized by recurrent, intense sexually arousing fantasies, urges, or behaviors involving prepubescent children or young adolescents under the age of 13 years. *Id.* Importantly, pedophilic disorder is a chronic condition - meaning it is habitual, ongoing, and always present. *Id.* Nowhere in his report does he even advise the Court that pedophilia may be a relevant factor or that such a diagnosis would impact his future risk to commit another child sexual exploitation crime.

Dr. Markey failed to recognize the extended length of time over which the defendant committed hundreds of child sex offenses, instead opining that "there is **no concern** for chronic sexual offending." Markey Report at 14. Similarly, though the "Sexual Offending" section should include items related to the defendant's historical and current sexual offenses, Dr. Markey failed to score the defendant for his current offenses which demonstrated "diverse sexual offending" (i.e., his stalking of a 14-year old girl for years, while at the same time amassing a collection of child pornography depicting prepubescent girls), finding only that there was no history of such diversity. *Id.* Again, Dr. Markey found "no escalation in sexual offending," despite the fact that the defendant stepped out from behind his computer where he downloaded child pornography from the internet, and engaged one-on-one with a child, stalking her for years and eventually accosting her on the street. *Id.* He also found that the defendant did not have the risk factor for denial of his sexual offense, despite the defendant's recitation in the PSR that he didn't know the child victim was 14 years old, and that he only obtained child pornography by "accident." Markey Report at 15. Ultimately Dr. Markey opined that the defendant's risk rating was "low," without detailing how he arrived at that conclusion and without explaining how that opinion comported with evidence that he engaged in hundreds of crimes over a period of many years. *Id.* Notwithstanding that opinion, Dr. Markey still advised that "a requirement is needed to prevent future sexual offenses, and Mr. Bolwell should attend sex offender treatment." *Id.*

In short, even if this Court should credit Dr. Markey's evaluation, it is a prediction of future sex offending by the defendant, and should not serve to mitigate the sentence to be imposed for the egregious crimes he's already committed.

**C.    The seriousness of the offense, respect for the law, and just punishment.**

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2).  The crimes committed by the defendant were not an isolated occurrence, but part of a pattern of sexually exploitative behavior toward children by the defendant for years. A sentence at the top of his Guideline range addresses each of these factors and is necessary to account for the egregious circumstances of the defendant's crimes. §3553(a)(2)(A).

**D.    Deterrence.**

Deterrence is also one of the factors driving the sentence in this case, and a sentence of at the top end of his Guidelines would address this concern. The recommended sentence will demonstrate to this defendant – and any others contemplating involving themselves in child exploitation - that this type of criminal extortion will not be tolerated by society, and will result in a minimum of decades in federal prison.

**E.    Other considerations.**

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."  § 3553(a)(2)(D). Though the defendant has a history of substance abuse and requests drug and alcohol treatment, his sentence of incarceration should not be mitigated in any way to address this or any other concerns. Any treatment, training or education can be accomplished during the long term of supervised release that is sought by the Government and which is required to be imposed for these crimes.

**F.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

The defendant comes before this Court as a "first-time" offender, despite the fact that he committed hundreds of crimes over a period of years. The fact that the defendant has no prior record puts him squarely in the hearland of most sex offenders, as the vast majority of federal child sex offenders have no criminal history at the time that they are sentenced. *U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320 (2011)* available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm. In this District, a review of the sentences that were imposed for defendants who committed the same type of offenses – production of child pornography - shows that most defendants were first time offenders who pled guilty. Significantly, in this District the majority of the sentences still involve decades in prison, even when the defendant did not have any hands-on abuse of the victim, and even when the sentence represents a "downward variance." *See United States v. Connor* (Cr. No. 19-57) (Sanchez, J.) (22-year-old defendant suffering from OCD and depression sentenced to 300 months' imprisonment followed by lifetime supervised release for coercing one 14-year-old victim online to produce sexually explicit images of herself and send them to him and maintaining a collection of images of child pornography from the Internet; sentencing guidelines called for life imprisonment); *United States v. Bristol* (Crim. No. 18-375) (Pappert, J.) (360-month sentence imposed on 62-year old, first time internet offender who pleaded guilty, no hands-on abuse by defendant); *United States v. Cutillo* (Cr. No. 18-391) (McHugh, J.) (25-year-old defendant suffering from adjustment disorder with mixed anxiety and depressed mood sentenced to 204

months' imprisonment for enticing a 15-year-old and 13-year-old victim to manufacture sexually explicit images and send them to him via the Internet; sentencing guidelines called for 360 months to life imprisonment); *United States v. Seibert* (Cr. No. 17-572) (Leeson, J.) (Defendant suffering from major depression and ADD sentenced to 360 months' imprisonment followed by lifetime supervised release for coercing a 14-year-old and 12-year-old victim online to produce sexually explicit images of themselves and send them to him via the Internet; sentencing guidelines called for 360 months to life imprisonment); *United States v. Jaquier Fishburn* (Cr No. 16-087) (Pappert, J.) (sentence of 360 months' incarceration on Guidelines of 324 to 405 months for first time offender who was 25 years old at the time of sentencing but who had sexually molested victim); *United States v. Cunningham* (Cr. No. 15-170) (Diamond, J.) (sentence of 240 months' incarceration on Guidelines of 235 to 293 months for 29-year old first time offender whose crimes were limited to the Internet); *United States v. Corcoran* (Cr. No. 15-132) (Baylson, J.) (sentence of 336 months imposed on Guidelines of 292 to 365 months' imprisonment, 20-year old first time offender); *United States v. Rebbie* (Cr.No.15-300)(Quinones, J.)(sentence of 240 months' incarceration imposed on Guidelines of 210 to 262 months for defendant, first time offender. No hands on sexual abuse of victim).

Though the Third Circuit has recognized the propriety of the district court's consideration of sentences imposed within the same district in addressing disparity pursuant to § 3553(a)(6), the district court is also required to address national uniformity. *See United States v. Orlando*, 2024 WL 3384919, *2, FN4, citing to *United States v. Begin*, 696 F.3d 405, 412 (3d Cir. 2012). The recommended top of the Guideline sentence comports with sentences imposed nationwide for production offenders whose crimes were confined to online sexual abuse. *See USSG Federal*

*Sentencing of Child Pornography Production Offenses* October 2021, at 44 (nationwide mean sentence of 234 months' incarceration for "remote" offenders who had no hands-on molestation of their victims).

### G. Restitution.

Restitution is statutorily mandated for victims of child sexual abuse and exploitation, in an amount no lower than $3,000 per victim. 18 U.S.C. §§ 2259(b)(2)(B), (c)(3). Six victims of the defendant's crimes have petitioned for restitution in this case. Based on the supporting documentation and the circumstances of the crimes committed by the defendant, the parties have reached an agreement regarding a restitution amount to be paid by the defendant, that is, a total of $43,000, and request that the Court incorporate that amount as part of the defendant's sentence.

In *Paroline v. United States*, the Supreme Court laid out the considerations necessary to determine restitution awards in child pornography cases. 572 U.S. 434, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014). The Court stated: "At a general level of abstraction, a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id*. at 459, 134 S.Ct. 1710. The assessment does not require a "precise mathematical inquiry," and involves the use of "discretion and sound judgment." *Id.* The Court listed "a variety of factors district courts might consider in determining a proper amount of restitution," noting that "it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount at this point in the law's development." *Id*. at 459-60, 134 S.Ct. 1710.

The list of factors is neither mandatory nor exhaustive, but "could include" the following:

a. The number of past criminal defendants found to have contributed to the victim's general losses;

b. reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;

c. any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);

d. whether the defendant reproduced or distributed images of the victim;

e. whether the defendant had any connection to the initial production of the images;

f. how many images of the victim the defendant possessed;

g. any other facts relevant to the defendant's relative causal role.

*Id*.

A summary chart that addresses the *Paroline* factors is attached as Exhibit L. The supporting documentation was provided to counsel in discovery and is available for the Court's review if needed. The summary chart also reflects the parties' agreement for total restitution to be made.

The 14-year-old victim in this case does not seek restitution.

## V. <u>CONCLUSION.</u>

Therefore, for the foregoing reasons, the government requests that this Court sentence the defendant according to the recommendation in the government's sealed Supplemental Sentencing Memorandum.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Michelle Rotella*
MICHELLE ROTELLA
Assistant United States Attorney

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Sentencing Memorandum to be served by e-mail and the electronic filing system

upon counsel for defendant:

Gail Marr, Esquire
gmarr@ymalaw.com

<u>/s Michelle Rotella</u>
MICHELLE ROTELLA
Assistant United States Attorney

Date:  <u>October 29, 2025.</u>