**YOUNG, MARR & ASSOCIATES**
**BY: GAIL N. MARR, ESQUIRE**         **ATTORNEY FOR DEFENDANT**
**I.D.: 75231**
**3554 Hulmeville Road, Suite 102**
**Bensalem, PA 19020**
**(215) 639-5297**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. CR 83-001 |
| | : | |
| v. | : | |
| | : | |
| DAVID BOLWELL | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

On February 14, 2025, the United States issued a writ that Defendant, David Bolwell, who had been housed at Cromwell-Fromhold Correctional Facility (CFCF) since his arrest by Philadelphia Police on February 12, 2025 for charges involving the same set of facts, be brought to Federal Court for an initial appearance on a Complaint and Warrant before the Magistrate Judge on February 18, 2025. On that date, the government argued for detention, and Defendant was detained at the Federal Detention Center (FDC). Thereafter, on February 19, 2025, the AUSA filed a motion for detention, a hearing was held on that same day, before the Honorable Carol Wells, and Defendant was Ordered detained. Defense Counsel filed a Motion to Reconsider the prior Detention Order, and a hearing was held before this Honorable Court on March 24, 2025, and the Order was affirmed; that Defendant be held in custody pending trial.

During this same time period, on March 11, 2025, an Indictment was filed charging Defendant with the following two counts; **COUNT 1**) that Defendant, on or about December 17, 2023 through January 29, 2025, "employed or used" Minor 1, who was under the age of 18, to engage in sexually

explicit conduct for the purpose of producing a visual depiction of that conduct, and attempted to do so, that is, by photographing and video recording Minor 1 engaged in sexually explicit conduct, and the visual depiction was produced and transmitted using materials that had been mailed and shipped and transported in and affecting interstate or foreign commerce by any means including by computer, in violation of Title 18 U.S.C. 2251(a), (e), and **COUNT 2**) On or about February 6, 2025 Defendant knowingly possessed matter, namely a Samsung Galaxy S23 cellular phone, which contained, essentially, visual depictions of child pornography, with the minors being prepubescent minors who had not yet attained the age of 12, in violation of Title 18, U.S.C. Sections 2252(a)(4)(B), (b)(2).

After discovery review, plea discussions and communication with counsel, on May 28, 2025, Defendant entered a plea of guilty to Count 1 of the indictment, with an agreement that Count 2 would be withdrawn by the government at the time of Defendant's sentencing, however, it was also agreed that the conduct charged in Count 2, as part of Defendant's stipulation with the government, was to be considered for calculation of the sentencing guidelines for this Honorable Court's consideration. A presentence report was to be prepared by the United States Probation Department, and the final report (PSR) was submitted by U.S. Probation Officer Talia Santella on October 24, 2025. The additional details of the plea agreement are specifically cited in the PSR beginning on page 4 and will be cited as necessary during Defendant's sentencing argument. Thereafter, Defendant's sentencing was scheduled to take place on September 16, 2025, and pursuant to Defense counsel's request for a continuance, was rescheduled to occur on October 31, 2025.

**FACTUAL BACKGROUND**

Defendant was contacted by Philadelphia Police Special Victim's Unit after he had approached a younger female neighbor, and handed her a letter, earlier that week. Thereafter, on February 6,

2025, a search warrant was obtained and executed at Defendant's home, where he was living with his brother, and Defendant's phone, as well as additional evidence indicating Defendant resided at that location, was seized by police. When contacted by the Detective, Defendant retained present counsel, and voluntarily went to the police district to be interviewed. At the time of the interview, FBI Agent, Leslie Trawick, was present. Defendant was cooperative throughout the interview, answering questions specifically about his conduct involving Minor 1. In fact, he admitted that he gave her the letter and he also admitted that he had taken photos, and videos of her, while she was in her bedroom, from his vantage point in his bedroom. He explained that sometimes while he was in the back bedroom of his home, which faced Minor 1's bedroom across an alley, he would see the lights on in Minor 1's room, or she would flash a light, and he would look and see her engaged in sexual activity; specifically masturbating. At the time, he did not know her exact age, and after review of the evidence by counsel it was clear that she was not prepubescent, and he convinced himself that it was, "a mutual thing". However, during the interview, he was told by police that she was only 14 years old, and he later stated to U.S. Probation Officer Santella, that he was, "sick to his stomach" when police revealed her age during that interview. PSR p.10, para 28. When questioned about the letter, Defendant first stated that he was trying to help her and keep her out of trouble by not going to her parents. However, when he was confronted with the actual content of the letter it was clear that he was potentially reaching out for a more nefarious reason. He admitted that she was attractive and he liked looking at her, but at the time of the PSR interview, he acknowledged it was, "offensive", and stated, "I knew it was sick…crazy". *Id.* At the end of the questioning by the Philadelphia Detective and FBI Agent Trawick, Defendant was asked about other images of what was alleged to be child pornography found on his phone, and the interview was terminated by present counsel. Since that time, and pursuant to this plea, Defendant has accepted responsibility

and acknowledged that he was viewing adult pornography on his phone and at some point clicked on a link that brought him to child pornography, which he then pursued because he was curious. Pursuant to the investigation, the images from Defendant's phone were determined to be ones of minors under the age of 12, with some images involving sadistic and masochistic behavior. In communications with Defendant, present counsel was told that he does not remember viewing those specific types of images, however based on counsel's representation regarding the existence of those images he has accepted responsibility and agreed to the corresponding enhancement in the sentencing guidelines.  It should be noted however, that in many cases where groups of child pornography images are downloaded, these types of sadistic and masochistic images are part of the group of images, and that in Defendant's case, there was no evidence presented that the Detective recovered any, "search terms" where Defendant was looking for this type of exceedingly offensive material.  In addition to those images, there were also many other images of Minor 1, and her friends, that were not child pornography, but showed Defendant's pursuit of Minor 1, consistent with his mistaken and "crazy" belief that she was possibly interested in him; not specifically knowing her age, and ignoring the criminal nature of his behavior in filming or photographing her.

**STANDARD OF LAW**

I. <u>SENTENCING GUIDELINES</u>: Title 28 U.S.C.A. Sec. 994, titled, "Duties of the Commission", states that: (a) the Commission shall promulgate and distribute to all Courts of the United States and to the United States Probation System,

(1) guidelines, as described in this section, for use of a sentencing court in determining the sentence to be imposed in a criminal case, including-

    (A) a determination whether to impose a sentence of probation, a fine, or a term of imprisonment;

  (B) a determination as to the appropriate amount of a fine or the appropriate length of a term of probation or a term of imprisonment;

  (C) a determination whether a sentence to a term of imprisonment should include a requirement that the Defendant be placed on a term of supervised release after imprisonment, and if so, the appropriate length of such a term;

  (D) a determination whether multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively; and

  (E) a determination under paragraphs (6) and (11) of section 3563(b) of Title 18.

(2) general policy statements regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in Title 18 U.S.C. Section 3553(a)(2), including the appropriate use of-

  (A) the sanctions set forth in Sections 3554, 3555, and 3556, of Title 18

  (B) the conditions of probation and supervised release set forth in Sections 3563(b) and 3583(d) of title 18;

  (C) the sentence modification provisions set forth in Sections 3563©, 3564, 3573, and 3582© of title 18;

  (D) the fine imposition provisions set forth in Section 3572 of title 18;

  (E) the authority granted under the Rules of Criminal Procedure to accept or reject a plea agreement entered into pursuant to Rule 11€ (1);

  (F) the temporary release provisions, et al.

Further, under Subsection (b)(1) it is stated that the aforementioned guidelines shall, for each category of offense involving each category of defendant, establish a sentencing range that is consistent with all pertinent provisions of title 18, United States Code.

The aforementioned Sentencing Guidelines are a starting point for the appropriate determination of a sentence in any particular case. Therefore, they are calculated pursuant to the PSR, by the U.S. Probation Officer, and both counsel for the government and counsel for the Defendant may challenge that computation either prior to the submission of the report, or potentially by making a motion for departure or request for variance based on the specific facts of the case or characteristics of the defendant. Initially, the guidelines were mandatory, however, after a challenge based on the 6th amendment to the United States Constitution in the case of *United States v. Booker*, 543 U.S. 220 (2005), the High Court essentially held that the guidelines were to be, "advisory" only; as stated above, a starting point. As stated under paragraph (2) above, the designation of the policy statements regarding application of the guidelines, is to further the purposes set forth in title 18, Section 3553(a)(2), which is where the factors to be considered by the Court for sentencing a particular Defendant and crime, are specified.

II. FACTORS TO BE CONSIDERED UNDER 3553(a)(2):

The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes in paragraph 2. 3353(a) (2) Those purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant, and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

(a)(3) the kinds of sentences available;

   (4) the kinds of sentence and the sentencing range established for—

      (A) the applicable category of offense committed by the applicable category of Defendant as set forth in the aforementioned guidelines.

   (5) Any pertinent policy statement….issued by the Sentencing Commission

   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   (7) the need to provide restitution to any victims of the offense.

After stating the statutory and case law authority for courts to consider when embarking on the task of setting an appropriate sentence, it should be finally noted, that a sentencing court must now consider all of the section 3553(a) factors, not just the guidelines, and where the guidelines conflict with other sentencing factors set forth in 3553(a), these statutory sentencing factors should generally override the guidelines. See *U.S. v. Denardi*, 892 F.2d 269 (3d Cir. 1989). In fact, when it comes departures from the guidelines, pursuant to Section 3553(b), "the controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing". *Id*. at 278. The court further holds that, "the present section seeks to aid the court by identifying some of the factors that the Commission has not been able to fully take into account….Presence of any such factor may warrant departure from the guidelines, under some circumstances, *in the discretion of the sentencing judge.* Similarly, the court *may* depart from the guidelines, even thought the reason for departure is listed elsewhere in the guidelines . . .if the court determines that, in light of the unusual circumstances, the guideline level attached to that factor is inadequate". *Id*. See Guidelines Sec. 5K2.0 (emphasis added). Finally, the court references the following, "The Commission intends the sentencing courts to treat each guideline as carving out a, "heartland", a set of typical cases embodying the conduct that each guideline describes. When a court finds an

atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court *may* consider whether a departure is warranted. *Id.* at 279.

**ARGUMENTS AND AUTHORITIES**

I.      In the case before this Honorable Court, the Sentencing guidelines have been computed based on Defendant's conviction to Count 1, manufacture or attempted manufacture of child pornography, thus Defendant's offense level computation begins at a 32.  It is then raised by 2 points to 34, based on "specific offense characteristics", and further raised 5 levels to 39 after the addition of points due to Sec. 4B1.5, (repeat and dangerous sex offender against minors), as Defendant admittedly took more than one image or video of Minor 1, on different occasions,  which is consistent with the factual basis for his guilty plea.  Thereafter, Defendant is given a reduction of an additional 3 points, due to acceptance of responsibility, resulting in a final level of 36 and a guideline range of 188 months to 235 months, as he has no prior record.  (15 years 8 months to 19 years 5 months).   Additionally, because Defendant plead guilty to Count 1, manufacture and attempted manufacture of child pornography, he is automatically facing incarceration of a mandatory 15 years (180 months).  Defendant would argue that the mandatory minimum in this case, of 15 years of incarceration, when he is already 59 years old, has no prior record, and would be 73 years old before eligible for parole on these charges, meets all of the criteria cited in 3553(a) and that a sentence in accordance with the guidelines, raising his sentence to a minimum of 8 additional months and a maximum of 53 additional months, would be inappropriate and unjust in this case.

(1) **Section 3553(a)(1): Nature and circumstances of the offense and the history and characteristics of the Defendant**.

This case involves two separate acts of sorts, and it should be noted that Defendant plead guilty to the more serious charge, of manufacture of child pornography, which calls for the aforementioned mandatory 15 years in prison. He was being investigated for his conduct involving approaching Victim 1, presenting her with a sexually explicit and inappropriate letter, and also taking photographs and videos of Victim 1. These images were taken by Defendant, using his cell phone, while Victim 1 was in a state of nudity in the confines of her bedroom, and Defendant was in his bedroom looking at her from his window, peering across a back alley, into her window. The latter, the taking of the photos and videos, is what formed the basis for his guilty plea. As a result of the investigation, and the eventual seizure of Defendant's cell phone, additional images of other child victims, victims that were unknown to Defendant, were recovered from his phone, and deemed to have been taken from the internet. This was the basis for Count 2 of the indictment, which is supposed to be withdrawn by the government, pursuant to the plea agreement.

With all of that said, Defendant possessed child pornography. All of the images were on his cell phone, and he began possessing them, via downloads or uploads from the internet, at most approximately 2 years ago, when he would have been 57 years old. Defendant also, during that same time period, began seeing his young female neighbor, Victim 1, about the neighborhood and specifically in her bedroom window engaging in masturbation. It is noteworthy that when FBI Agent Trawick was questioned as to how many different times Victim 1 was masturbating in front of her window, defense counsel was told it was 17 different dates/occasions, pursuant to the information retrieved from Defendant's cell phone images of her. Although there was also evidence that Victim 1 put cardboard over her window at one point, it was taken down again, allowing Defendant to continue viewing her activity, and illegally photographing and videotaping it as well. While this does not excuse Defendant's behavior in any way, as demonstrated by his guilty plea in

this case, it may help to explain, in his state of utter loneliness, how he got what he himself later called, "the sick or crazy idea", that this young girl may have been signaling him to her behavior. Her back window was facing his back window, and he could not control his urges to look at her and unfortunately, his behavior escalated to taking images, creating child pornography, and eventually handing her the sexually explicit letter that led to his demise. Fortunately, Victim 1 gave the letter to her mother, and there was never and physical contact, other than handing her the letter, with Victim 1. Defendant should not be treated as though physical contact had occurred, because no one has a crystal ball, and can know whether if given the opportunity he would have pursued contact (potentially relational or sexual) with Victim 1, or alternatively, come to his senses as the father of a 28-year-old daughter for whom he was always very protective, and walk away from Victim 1.

    In terms of Defendant's history and character, much of it is narrated in the PSR, which is very thorough. Defendant has behaved all of his life, up until this point, as a caretaker and provider to his parents and daughter. He had a few serious relationships, but in the last several years was clearly lonely, struggling with depression, and overwhelmed caring for his parents until both had passed away a few years ago. He had been working his entire life as a wallpaper hanger, and has mostly worked for his uncle during his career. It is not clear why his employment records were not able to be located, but he has engaged in this line of employment throughout his adult life. Finally, Defendant has expressed extreme remorse to Victim 1, her family, and the other unknown victims, for his abhorrent behavior, in both his interview with Officer Santella for the PSR, and the letter that is attached to this memorandum. He understands what he has done, and has accepted responsibility for his behavior by giving a voluntary statement of admission and pleading guilty; and by never forcing Victim 1 to have to appear or testify in court.

Defendant has unfortunately been the victim of both physical and sexual abuse. As he explained during the PSR interview, he wore leg braces as a child, and would take them off due to the pain and bleeding, and his father would beat him if he saw Defendant had taken them off. PSR p. 14, para 59. He also grew up witnessing domestic violence, and was bullied in school because his older brother was gay; at a time when that was generally not accepted like it is today. *Id*. He also speaks of two occasions when he was sexually abused, once briefly by a family member, and once by his teenage female babysitter. *Id.* When he tried to get help, by telling his parents, his father would again beat him, because the scenario didn't seem logical to his father. We now know, that unfortunately, situations like this happen all the time in our society, but back when Defendant reported it, society was not as keen to these types of occurrences. Obviously, as a result of his father's response, Defendant never got any therapy at that time for his abuse. Despite all that Defendant had been through with his father, in the years just prior to Defendant's criminal behavior in this case, he cared for his father who had dementia and multiple sclerosis, first at their home, and then at the nursing home where his father had to be placed. During his adult years, he had times where he had mental breakdowns to the extent he went to Friend's Hospital under a voluntary 201 commitment, and had short periods of times where he abused drugs to cope with the stress and pain in his life.

Although Defendant had the aforementioned issues, attached to this Sentencing Memorandum are numerous letters written on his behalf; most notably the letter and pictures from his 28-year-old daughter, Brielle. Brielle, would describe her dad as being a great support financially and emotionally. She is in shock over these charges, because she describes her father as always being there for her, and being overly protective with her as a child. He was always appropriate with and around her friends, and she never imagined he would have engaged in this behavior. With all of

that said, Brielle, while not condoning her father's behavior, is a great source of support for him and has been, throughout his incarceration. His brothers are also a source of support for Defendant, as is Brielle's mother, because all of them recognize that this behavior does not define the man they have known for all of their lives.

Finally, while Defendant has been incarcerated, since February 12, 2025, first in CFCF, and later, as of February 18, 2025, in FDC, he has not had any behavioral issues, despite his being overwhelmed with anxiety and depression as a result of his sudden change of residence. He has never been incarcerated before, was taken into custody unexpectedly when he went with counsel to give a voluntary statement to Philadelphia Police, and has never returned home since that day. These circumstances might cause some offenders to act out, however, Defendant has sought treatment for his mental health adjustment disorder, has taken numerous courses that have been offered at the prison, and has made every effort to acclimate to his new environment. Defendant's certificates are also attached to this memorandum, as well as some limited medical records to show his treatment for both physical and mental health disorders at the prison. Defendant would argue that his physical condition should be taken into consideration as it pertains to the assessment and calculation of his guidelines; that a variance should be considered by this Honorable Court. Defendant is 59 years old, with many health problems, including COPD, asthma, back injury and former removal of cyst that causes severe back pain, presbyopia (vision deterioration), disorder of the lacrimal system (also eye/vision related), candidiasis, post-traumatic stress disorder, and panic disorder. The mandatory minimum of 15 years in this case is already a sentence that may lead to Defendant's not being able to remain healthy enough to complete his sentence and reach parole. Any sentence in excess of that, is one that will most likely result in Defendant dying in prison. While the nature of these charges are such that is understandable that an extended sentence of

incarceration is warranted, they are not so severe, factually in this case, that they should result in a death sentence for Defendant behind bars.

**(2) Section 3553(a)(2): Need for the Sentence Imposed**

The considerations pursuant to this factor are that the Court should impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, deters crime, protects the public from the defendant and provides the defendant with needed medical care in the most effective manner. See also *Gall v. U.S.,* 552 U.S. 38 (2007). Defendant acknowledges that charges involving exploitation of a minor are extremely serious, as is demonstrated by the 15-year mandatory minimum sentence this Court is required to impose. However, Defendant would note that the statute for which he plead guilty has, "varying degrees" of ways in which an offender can victimize a minor in order to effectuate his desire to produce or manufacture child pornography. Specifically, **18 U.S.C. 2251(a)** states that, "any person who **employs, uses, persuades, induces, entices, or coerces,** any minor under the age of 18, to engage in any sexually explicit conduct, for the purpose of producing any visual depiction of such conduct, shall be punished under subsection e if the person has reason to know that such depiction will be transported or transmitted using any means of facility of interstate or foreign commerce. While the statute covers a range of behaviors, the government in this case only charged Defendant using the wording that Defendant, "**used or employed**" the victim. Defendant asks this court to consider that there is no designation in the sentencing guidelines to account for the varying degrees of force imposed upon the victims of sexual exploitation such that someone like Defendant who videotapes a young girl who is naked or partially naked masturbating in front of her window, is statutorily treated the same as a defendant who coerces a minor into performing sexual acts for the purpose of specifically making child pornography to disseminate over the internet. In *U.S. v. Fletcher*, 634

F.3d 395 (2011), the defendant used a rouse of getting young teen girls to come to his home to get airbrushed clothing he would make for them, or to do house cleaning, and then he would groom them and eventually attempt to coerce them into allowing him to take nude photos of them. This situation is far different than the case at bar where Defendant took photos and videos of Victim 1, while in his bedroom watching her through both of their windows. Of course, Victim 1 has been emotionally harmed in this case; although she didn't know at the time she was being filmed, she now knows, and Defendant himself has stated that she must feel, "devastated, scared, untrusting of people". However, Defendant's behavior lies at the lower end of the scale of coercion, and thus urges this Honorable Court to consider him for a downward variance from the guidelines to the mandatory minimum of 15 years.

    Defendant would also argue that the need to protect the community is a lessor factor in his case, and would cite his Forensic Psychological Examination and Report by Dr. John Markey, where he is found, in the Doctor's conclusory opinions to have a summary risk rating that is low. Furthermore, for purposes of incarceration and supervised release, Defendant will be in his mid-seventies before he is eligible for release just based on his mandatory minimum, and thus his likelihood for reoffending is low. He has the support of his daughter, who is now aware of this behavior, and is still willing to allow her father to reside with her upon his release. Also, Defendant wants to get treatment to address his issues, the ones that enabled him to engage in this type of offensive and illegal behavior to begin with, and it is argued with that Court Ordered treatment, during his extended period of incarceration, he is less likely to present a risk of harm to the public. Finally, Defendant avers that a 15-year sentence is certainly sufficient to discourage others from engaging in this type of conduct, and the added time suggested by the guidelines would be

negligible from a deterrence perspective, but a considerable hardship and excessive punishment for him under these circumstances.

### (3) Section 3553(a)(3): Kinds of Sentences Available

Defendant concedes that despite his age and health issues, he has plead guilty to an offense with a mandatory minimum period of incarceration and thus other options can not be explored.

### (4) Section 3553(a)(4): Kinds of Sentences and the Sentencing Range Established by the Guidelines

"Section 3553(a) permits variance because, based on the unique facts of a particular case, austere adherence to the averages and generalities of the guidelines can be unjust and contrary to reason. In some cases, the sentence suggested by the guidelines is not appropriate, as one size can not be said to fit all. No chart of numbers will ever fully contemplate, quantify, and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula. *U.S. v. Coughlin,* 2008 W.L. 313099 *5(W.D. Ark. 2008) (*citing Gall* 128 S. Ct. at 595).

As previously stated, Defendant has many factors which would point to the imposition of a less than guideline sentence in this case. Most notably, the 15-year mandatory minimum sentence more than fulfilling the criterion for consideration under Section 3553(a)(2).

### (5) Section 3553(a)(5): Pertinent Policy Statements

The Sentencing Guidelines have been challenged by various rulings of the Courts, specifically in reference to child pornography possession cases. In *U.S. v. Grober*, 624 F.3d 592 (2010), the 3rd Circuit held that, "the District Court when rejecting the recommended Sentencing Guidelines range, adequately addressed government's arguments regarding the rationale for that provision, and the District Court provided a sufficiently compelling justification for not applying the recommended Guidelines range". In this case, defendant plead guilty to 2 counts of transportation of child pornography, 3 counts of receipt of child pornography, and 1 count of possession of child pornography. In that case, the guidelines were calculated, which started at a base of 22, after

enhancements rose to 40, and with the 2-level acceptance of responsibility ended at 38.  With that level, Defendant was facing a guideline range of 235 months to 293 months of incarceration. *Id*. at 596.  The Court opted to sentence Grober to the mandatory minimum of five years, the government appealed and the Defendant cross-appealed. *Id.*  In this case, the District Court examined a handful of district court opinions and was concerned that the guidelines for child pornography offenses were not based on empirical data, and further found, "that most of the enhancements are essentially inherent in the crime, and thus apply in nearly every case". *Id.* at 597. The Court reasoned that it is difficult for the defense to challenge the government's characterization of the egregiousness of a defendant's conduct, and that Grober's conduct fell, "squarely within the heartland of downloading cases", and, "it is truer to say that the designated guidelines for the typical downloading case, is what falls outside the heartland". *Id.* at 598.  Further, in *Grober*, the Court notes that in 2003, Congress, without seeking any input from the Commission, passed the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act, (PROTECT Act) which resulted in several significant changes to the child pornography statutes and guidelines, one being, adding the image table which increases the base level by up to 5 points for the number of images being over 600.  It also added a five-year mandatory for receipt of child pornography. *Id* at 606. Also, in 2004, the Commission increased the guidelines base levels for possession from 15 to 18, and for trafficking from 17 to 22, and thereafter the Commission was, "concerned that setting the base offense level any higher than 22 for trafficking and receipt offenses would affect the proportionality of other guidelines, and could for example, call for a higher penalty than that typically imposed on a defendant convicted of conspiracy to commit murder and kidnapping". *Id. c*iting, *The History of the Child Pornography Guidelines* at 46, 47-48.   The Court went on to reference the 2nd Circuit case of *U.S. v. Dorvee*, 616 F.3d 174 (2nd Cir. 2010), where they concluded that Section 2G2.2 is,

"fundamentally different" from other guidelines, and unless it is applied with great care, can lead to unreasonable sentences that are inconsistent with what Sec. 3553 requires. *Id*. *Dorvee*, further cited as proof of the irrationality of Sec. 2G2.2 that a Defendant who actually engages in sexual conduct with a minor may be subject to a lower guidelines range than one who distributes child pornography. *Id.*

In this case, Defendant argues that the reasoning in the aforementioned cases should be considered for purposes of determining his sentence. He downloaded child pornography, as was stated for the five-year mandatory in *Grober*, which is squarely within the heartland of that type of case. Defendant here, had additional behavior, in that he took images of a young lady, later confirmed to be 14 years old, as she was naked in her window, and he was peering from his window across the alley. That resulted in him being charged and now convicted of manufacture of child pornography, which obviously would increase the time he would be facing; and it has. He is facing an additional 10 years, just to meet the mandatory for that charge. The policy arguments made in the aforementioned cases apply to him, at least partly, and should give this Court the justification, and hopefully desire, to cap Defendant's sentence at the mandatory required for this case, and go no further.

**(6) Section 3553(a)(7): Need to Provide Restitution to Victims**

In this case, as part of the plea agreement, Defendant has agreed to pay restitution and fines as determined by the Court. Defendant acknowledges that he is responsible for fines pursuant to applicable statutes, and is not contesting those amounts. However, as Defendant is now indigent, and is expected to be incarcerated for at least the next 15 years, he is requesting that he have little or no fine imposed, as he will be unable to earn the money and has little to no assets left since his incarceration, as assets he had were needed for legal fees and other immediate expenses.

      II.      Defendant's sentence in this case warrants a departure not only based on the above arguments regarding the Guidelines and Sec. 3553(a) factors, but also due to his age and level of infirmity. The Guidelines recognize some potential departure under 5H1.1, p.s. however, Defendant's age and infirmity may not exactly meet what is needed for that departure. Alternatively, in *U.S. v. Sullivan*, 414 Fed. Appx. 477 (2011), the Court considered Defendant's health issues, and while it found he did not qualify for a specific departure under the Guidelines, it did find his failing health to be a sufficiently, "salient factor", so as to vary from the Guidelines range by eight months under 18 U.S.C. Sec. 3553(a). *Id*. at 481. Defendant is seeking a variance from his guideline range, in accordance with *Sullivan,* to impose the mandatory minimum sentence rather than the Guideline range, which calls for the same variance as applied in *Sullivan,* at least at the bottom of the range; 8 months. He has failing vision, COPD, which is failing respiratory function, and painful back injury, as well as deteriorating mental health. All of these ailments support the downward variance he is requesting, and are also noted in the PSR for potential consideration by this Honorable Court at the behest of the U.S. Probation Officer, Ms. Santella. PSR p. 25, para 123.

**CONCLUSION**

    For all of the foregoing reasons, Defendant respectfully submits that a sentence of 180 months, comprised of the required mandatory minimum, is sufficient but not greater than necessary to comply with the statutory directives set out in 18 U.S.C.A. Section 3553(a), and thus would be an appropriate, fair and just sentence. A period of supervised release of five (5) years would also be sufficient, if needed at all, to meet the directives and policies of the sentencing Commission and this Honorable Court, especially at what will be an extremely advanced age at the time of release. Defendant has no argument as to his restitution as he recognizes the harm that he and others have

done to these minor victims by this abhorrent behavior, but asks that minimal fines be imposed, due to his current indigency and his expected indigency moving forward in his life.

Respectfully submitted,

*Gail Marr*

Gail Marr, Esq.

-